Illinois Appellate Court's Fifth Division is now in session. The Honorable Justice Raymond Jefferson is reciting. Good morning, folks. Please be seated. And our next case for this morning is Nott v. Swedish Covenant Hospital. Here's how we'll proceed. We're allocating 20 minutes aside with an additional 5 minutes for rebuttal. And with that, we'll begin. Counsel for the appellant. Just to remind you, if you could, one, keep your voice up, and two, be sure to identify yourself when you step up to the podium. Great. Whenever you're ready, you can begin. So, as Your Honor has probably read, this case involves an individual who was going into a hospital to get some counseling on a problem that he was having. And before I get into some of the facts, this case deals with a subject that is very, very important these days, and that is the mental health crisis that we're dealing with. Oftentimes, people with alcoholism, drug addiction, whether it be voyeurism, we constantly hear about shootings at schools these days. These people are entitled to get the help they need without being dissuaded from doing so in fear that the medical providers that are supposed to be treating them and helping them will not call the police on them. Now, we all know from law school and other areas that there's an axiom where if a client comes into a medical professional's office or an attorney's office and, let's say, tells the attorney, I've committed a crime. For example, I shot John Doe last week. The attorney is under no duty to disclose that information. Now, if that potential client comes into an office, the attorney's office, for example, and says, I am intending on shooting John Doe next week, then that attorney has a duty to report that. Now, this axiom has been codified in all the statutes, the mental health statute, the other statutes involved in this case, and the information that is learned during the course of treatment is protected, confidential, and privileged unless certain things are met, and those are the issues in this case. Mr. Knott had a problem with voyeurism. He was seeking help. This is an individual that was doing the right thing and said, you know what, I need to speak to someone about my problem. He went in and wanted to speak to a counselor. What happened was that the defendants in this case, and the only two that are left here are Swedish Public Hospital. Yeah, I'm going to start with that. Before we get into the immunity, which is clearly we do want to talk about, you settled with the social worker, and as the defendants pointed out in their brief under Gilbert, that gets rid of any vicarious liability anybody else can have for that person's actions. So I am not exactly clear, because you didn't respond to that argument, what's left of your case. Well, first of all, agency has not been addressed in this case. No, I'm assuming there was agency. Their position, and the Supreme Court has said, assume she's an agent, assume that the hospital would be vicariously liable for her conduct. Under Gilbert, no liability because she's settled. That's the law. The claims against the hospital and Dr. Newbold are separate. That's what I'm saying. What will they do? Well, first of all, the Swedish Covenant Hospital charged nurse, and this is the nurse that's in charge of the entire department and all the other nurses, and everyone operating, including Karen, the social worker, providing treatment in that department at the time. This charged nurse, Charlie Travis, would be the one in control of them. The Swedish Covenant medical records themselves state, charged nurse Travis contacted 911, called the police. I think it was a direction that she called the police, that Karen called the police, but it's double hearsay. No, no. No, the record specifically says... Unless, how do you rely on the record? What's the gauge of the record? But, in any event... It was... The record states, charged nurse contacted 911. I can get the exact... The record is 2162? Yes. Okay, so... And it specifically states that this charged nurse contacted 911. Okay, but what do we know that this charged nurse told 911? How do we know that this charged nurse disclosed confidential information when she called, he, I'm sorry, it's a he, he called 911? What's the evidence of that? Well... We know that a charged nurse called 911. Well, that's a violation of the statute right there. To call 911? A charged nurse can't call 911? Exactly. A charged nurse can, of course, call 911. There has to be a disclosure, an impermissible disclosure, that's not immune. And my question is, what's the evidence that the charged nurse, or anybody besides Karen, made a confidential disclosure to anyone? Well, the police came to the emergency department, and also, the police came to the emergency department after Travers called 911. So, those are facts left still to be tried, as to what exactly he told them. Because the police ended up arriving at the scene, and I doubt that this charged nurse would call the police and say, Hi, I'm charged nurse Travers from Swedish Covenant Hospital, how are you, how's your day going? Of course he provided information to them, and they arrived at the scene. Can I just back up a minute? Just the procedural posture of the case. The case was in a motions room, true? True. When it was in the law division, it was in a motions room? Correct. And then it was assigned out for trial? Is that right? No, it was still, these motions had been pending from the original filing of the suit, and then we conducted some discovery. So, Karen filed an affidavit, we conducted discovery on that affidavit, and there are two 619 motions, and then these motions were filed after the third amendment complaint. Okay. So it was still before the motion judge. Okay, that's why I was puzzled, because I didn't realize that Ms. Manolo, Judge Manolo, was ever a motions judge. I thought she was a trial judge, but that's my mistake. Yeah, no, she became a motions judge. So it wasn't up for trial. It was still pretty much at the pleading stage. It actually wasn't at the pleading stage. I mean, all the discovery that was done was based on these motions. Your first argument, you complain about the lack of an affidavit in support of a 2619 motion. What precisely, what are you alluding to? Well, the felon, Karen, provided an affidavit, and so we conducted discovery on that affidavit, her claiming that she had good faith. The hospital, in this case, and Dr. Newbold have never provided any kind of an affidavit, and simply stating, oh, I'm called in good faith, is not sufficient enough to sustain their burden for claiming that they have a presumption of good faith. What is it about it? Well, they do have a presumption of good faith as a matter of, it's an operation of law, right? As far as statute operates, and then that can be rebutted. Well, if they call, and they're only supposed to call DCFS, and that's another point we have to get to. Now, here they call the police. Nowhere in the Inquis statute does it say that they should call the police. In fact, it gives a 1-800 number or hotline for them to call. But there's immunity under the mental health code for calling anybody, reporting to anybody. Well, that gets into the language of the commission of an intended crime, and it has to be clear, imminent danger of serious bodily harm. Now, I'm not going to get into the issue of serious bodily harm, whether placing a camera in a bathroom is serious bodily harm. I'm not going to even talk about that. It's a real big picture issue that I have in reading this and getting ready for today. This is a case where your client pled guilty to 26 felony counts, and he got probation, a very generous sentence from a felony court judge. And he accepted responsibility, and he expressed remorse, and he apologized. And yet, here we have a tort action where you seem to be trying to shift responsibility to the healthcare provider, to the hospital. It just didn't really square for me. Well, let me speak to that. And that's a good point. You talk about how he's been damaged, that this reporting led to him losing his job, and it's damaged his reputation. But that's not what damaged him. What damaged him is when he engaged in 26 counts of felony conduct. So, if I may address that. So, first of all, as your honors notice, the only thing that the defendants can say here is to smear Mr. Knott's name. And that's the whole purpose of these statutes. The very first thing they point to is that he's a felon who admitted to X number of counts. What we're concerned with here is, what did these defendants know at the time Mr. Knott met with them? I don't mean to smear Mr. Knott. It goes directly to whether your client could ever have damages in this case. My client totally can have damages, and I'll tell you why. The defendants in this case were required to call DCFS only. And had they done so, which that was done by the counsel. He had already been interviewed by the police. They were already on to him. If you read the testimony. And I handle the criminal case, and I know exactly what happened. The original videotape did not have Mr. Knott on it. They could not tie him up to the original video that was taken from the bathroom. And I will say this too. The video camera was placed in the faculty bathroom, and on the same floor there was boys and girls bathrooms. He did not place the camera in the boys and girls bathroom. So it's grandiose for the defense to kind of say, oh look at this child pornographer, and try to paint him as some kind of horrific human being. The police obtained his computers, his phones, and they never found any child pornography. Those cases or charges were dropped, first of all. I want to make that clear. He was not a child pornography. He was not a pedophile. He had a problem with voyeurism, and he admitted it. He was trying to get problems. So what should have happened in this case? Where damages should never have been incurred. He should have gone to the hospital, gotten the help that he needed, the mental help that he needed to help him with his voyeurism. And there's a drop box at the hospital even, in their computer system, for voyeurism. It's a known addiction and a problem that has to be dealt with. They should have treated him. Now, if they had reason to call DCFS, and only DCFS, not the police, and I'm going to get to that in a second. They called DCFS, and DCFS told the counselor, after she reported everything she learned in the emergency room that day, that they weren't going to open up an investigation or even do a report. And DCFS is the only entity that is responsible for investigating these actions and whether anything should be done, and contacting any local police force departments, if necessary. DCFS, in this case, and if you ever had rebuttable evidence to refute the rebuttable presumption, this is a clear-cut case. This is a textbook case. Reading the briefs, you list a series of things that you believe rebut the presumption, some of which could equally have been mistakes. And there's a willful and wanton pausing in the discussion. There's a burden that has to be met, and you have to show that more than the act was done, it was done based on a wrongful reason. Negligence is not one of the reasons. The fact that I didn't read the manual right is not one of the reasons. And I think in the motions courtroom, the case the judge wants to hear, are the police that give rise to your argument. Well, the statute portion that you're referencing talks about it has to be malicious, but it also can be based on a violation of the statute. They violated the statute. That is one of the portions, if you read it, there's three ways that the presumption does not apply. That's if it's malicious or was intended with wrongful purposes, or they violated the statute and they have violated the statute. What are you citing counsel? Are you citing a statute or are you citing a case? ANCRA. Okay, but we're not just under ANCRA, we're also under the immunity provision of the mental health and developmental disabilities. And health information is protected under those statutes and that specific statute unless the health professional knows of an intended crime and it has to be clear. I don't see the word intended crime anywhere in the statute. It has to be clear. Clear and imminent risk of serious physical or mental injury being inflicted upon the recipient or by the recipient on himself or another. Correct. If the therapist in their sole discretion determines disclosure is necessary to prevent it. That's what the statute says. It doesn't say anything about the crime. It says whether the therapist in their sole discretion believes disclosure is necessary to protect against imminent risk of serious physical or mental injury. Clear imminent risk, meaning first of all it has to be clear. In this case, the hospital knew that the camera had already been taken down. There was absolutely no evidence that anyone could provide that anyone was even videotaped by the camera or that the video camera worked. There was no evidence that any children were videotaped at all. No one even knew at that point. The only evidence they had was that the camera had already been taken down before Mr. Matt got to the emergency room. Where is the evidence that everybody knew the camera was down? It's in Karen's deposition. She signed an affidavit saying she believed this to be true and her deposition testimony, as I read it, goes back and forth a little bit. I've never clearly assessed where I was aware the camera was down. At least four different places in her deposition and I could search through my... I mean, briefly. Yes, she admitted that her understanding was that the camera was taken down before Mr. Matt got to the emergency room. That's her only understanding. And again, with regards to... She's out. You settled with her. Right. What difference does it make? Because the other defendants have not presented any evidence that the camera was up. The camera was already taken down. And that's the facts of the case. The camera went to police and you talked about the police investigating this prior. The police already had the camera before Mr. Matt went to the emergency room. So the camera was taken down. That's the facts of the case. So there can't be a clear imminent risk of injury to anybody because imminent means... What's the evidence that hospital defendants knew the camera had been taken down? That's my question. It's in their records. That's the only evidence that there is in this case. And if there's a question as to whether or not the camera was still up, then that's a question of fact for the trier of fact. In this case, it isn't appropriate for dismissal at a 2-6-19 stage or motion. And that's the whole gist of this. So the defendants never knew that they knew the camera was down already. They didn't know whether or not... You just lumped them all together. It can't be cured because she's gone. So who knew? And what's the evidence that they knew? Well, again, they contacted the police. They contacted... And here's another thing I want to talk about. So these defendants are left, Swedish Covenant Hospital, being charged with... We're going to let you talk what we're trying to talk about. But could you answer the question first? What's the evidence that the other defendants knew that the camera had been taken down? The evidence is that Karen was in the emergency department discussing this matter with these defendants. The charge nurse, Dr. Newball, all of them were in there. What they call the care team. Okay, so somewhere they acknowledge, oh, Karen told us that the camera had been taken down? Well, where's the evidence? Have they produced any evidence that the camera was still up and that there was a clear image? Now, they want to use the statute to their benefit. So they have to show, in their mind, there's clear imminent risk to someone. What evidence have they shown that there was clear imminent risk? Meaning that there was clear, without a doubt, an identifiable person that was at risk of imminent harm. Meaning it's about to occur in the future. They can't do it because the camera was already taken down. They don't know if the camera worked. They don't know if the camera captured anybody. So it's in the past. And, again, these statutes codify the axiom that when someone comes in and talks about past crimes, that's not reportable. If someone comes in and says, hey, I'm going to do this in the future, then that may be reportable. And that's the whole purpose of these statutes. They cannot show. It's funny because the statutes say the therapist in their sole discretion. But you're saying, no, no, overlying that is this past crimes versus future crimes distinction. And then I guess nobody would be disturbed that a Chicago public school teacher is putting a camera in a bathroom in a school. They shouldn't be concerned. I'm not saying they should be concerned. I'm not saying at all that this conduct is, you know, condonable. It's someone who has a sickness, who has mental illness, and he's trying to do the right thing, and he's trying to get help. And these statutes are there to protect these people. And at this point, as far as the anchor statutes, they were only supposed to call DCFS. And DCFS are the experts in this case. And they even told Karen when she called, we're not going to do an investigation. We're not going to do a report based on everything you told us, where the camera was placed, who was involved. They didn't even do an investigation. And they're the sole entity charged with investigating these and whether they should bring on any police departments. All of the cases that have been cited. So are you suggesting that the actions that were taken were appropriate until they finished talking to DCFS and everything they did after that, contacting the police, that was when they skewed? Is that what you're saying? Well, first of all, based on the anchor statute and that presumption, they didn't even have, not knowing, and the anchor statute talks about a child who is known to that mandated reporter and has abuse. There was no children known to any of these defendants. They didn't even know if children were involved. That's all they knew. But all they knew was that the camera was placed in the staff. Yeah. That's an important fact. That's all she knew. And the fact when Karen goes to the police department. What was that? You brought up the fact that it was a staff bathroom. Was that staff bathroom used by a student? In this case, the child who was involved was autistic and he happened to go into the bathroom and use it. But normally, no, they would not use the staff bathroom. There was a boys' and girls' bathroom on the same floor. Now, of course, again, you can look at this at first glance and say, this is disgusting. He's putting a camera in the school bathroom. But he has a mental health problem that he's trying to get resolved and get help for. And that's the purpose of these statutes. And this is the awful policy. That's right. And the legislature has balanced that and also said, we want to protect other people, too. Right. So it's not just a one-way street. Correct. And that's a policy judgment that the General Assembly has made. We're really not in a position to second-guess that. And they said that DCFS is the sole entity that's charged with protecting the children. When they were contacted in this case, and this is the strongest evidence you'll ever have in a case to rebut this presumption, DCFS said, we're not doing a report and we're not doing an investigation. And then they went out and they ended up calling the police, these defendants did. And, again, it's in the medical records that the charge nurse actually contacted 911. That is not reporting, and some of the case law gets into that, too. There's a difference between reporting and investigating. And the Franciscan case talks about that. How is this investigating rather than reporting? Because you can contact, and if they only contacted DCFS, the case would have ended there. And DCFS didn't even open up an investigational report. That's the reporting part of it. Karen, then, and the supervisors and whoever else at the hospital, when Karen goes to the police department some days later, a week later, that's now continuing an investigation. She's no longer reporting. She's out. You're still out. I understand that. I understand that, but she's out there. There isn't any connection between anybody else and her going to the police a week later. In fact, someone from the hospital told her to leave when she called in. Exactly. Exactly. When she gets to the police department almost a week later, the people, supervisors, whoever from the hospital says, first of all, Karen admits, I don't think I should be talking to you. I may be overstepping my bounds. So right there, she's admitting that she knows that calling DCFS and the police is incorrect. It's incorrect for her. It's incorrect for these remaining defendants as well. That's not an admission. I don't think you can make that into an admission. Settling with the agent releases the principle. So you settle with the agent. But I'm talking about these defendants. So these defendants contacting 911 was not reporting. Reporting is the agro. Contacting the police and providing police with information, that's investigating. That's not reporting. The statute only provides. There's not one section in there that provides that the reporters are supposed to contact the police. And this is where they violated the ANCRA statute, is that they failed to, first of all, execute a mandated report acknowledgement form, which says, I've read the statute, and I understand I'm supposed to call the 1-800 hotline. That's the first violation. Didn't she tell your client right up front that she was a mandatory reporter? I believe so. And that's a good point, too, because Mr. Knott, as a teacher, he was a mandated reporter, and he filled out the ANCRA mandated reporter acknowledgement form appropriately under the statute. He complied with the statute. These defendants did not. Nowhere could they provide the acknowledgement of mandated reporter status, which would have told them not to call 911. They're supposed to call DCFS only. It wasn't a child known to them. So they violated the statute. So if they violate the statute, it's not reporting. It's now investigating. When they call 911, that's not reporting. Reporting is to DCFS. When they call 911, that's investigating. And it's not even allowed under the ANCRA statute. And under ANCRA, the only references to the police department are is if DCF feels it's necessary to contact the local police department or DCF thinks that a local police department should get involved. That's the only thing that's required under ANCRA. Now, as far as the other statute, there is no clear imminent risk here. They cannot show. They want protection of the statutes. They have to show that there's a clear imminent risk to someone. The only evidence in this case is that the camera was already taken down. So how can they show and get protection under those statutes when there was nothing about to occur in the future? And you can't just say, and I noticed it the other way, well, you know, they thought that if you placed the camera in the bathroom at a school, you know, he could maybe place another one next week. That's the same thing as saying when a client comes into your office, well, I shot someone last week. And the attorney's saying, well, if you shot someone last week, you could shoot someone next week. So how do they report this guy? That's not allowed. That's not what the statute's allowed. You have to have evidence of clear imminent risk. And there was none here. The camera was already taken down. They didn't know if anyone was recorded, nothing. So they didn't have the authority to contact DCFS, and especially 911 in this case. We're down to our final minute. That's if you look at all the case law that has been cited. In all of those cases, DCFS was the only agency contacted. DCFS conducted investigations and found instances of abuse, and that's why those cases were found that the rebuttable presumption had not been met with sufficient evidence. And for the rebuttable evidence to be rebutted in this case, it just has to be sufficient to support a finding of the non-existence of the presumed fact. So in this case, we have enough that shows that, one, under ANCRA, there was no identifiable child. DCFS already said, there's just nothing here that wants a report of investigation. Under the other statutes, there's no clear imminent risk of any injury occurring to anybody. So there is no protection. There is no presumption of good faith under any of those statutes. If they want protection of the statute, where's the clear imminent risk of substantial violence to someone in this case? Other than speculation that, oh, well, he may have to place the camera next week, or, you know. Okay, great. We'll hear from you in rebuttal. Counsel, whenever you're ready. May it please the Court, Counsel. My name is Garrett Boehm. I'm here on behalf of Swedish Covenant Hospital and Dr. Ann Newbold. This Court should affirm the dismissal of all counts against the defendants for four reasons. Plaintiff's claim is premised upon improper reporting of child abuse or neglect to the Chicago Police. First, I'll address the two counts against Dr. Newbold. The claim against Dr. Newbold is baseless and meritless, unsupported by anything in the record. And because of that, those two counts should be affirmed. The dismissal of those two counts should be affirmed. The second issue, and I'll address all of these in more detail, but the second issue is Counts 1, 3, and 5 against Swedish Covenant Hospital based upon the vicarious liability theory that the alleged apparent agent, Stacy Kieran, acted improperly in her reporting. However, as the Court has noted, the claims against Ms. Kieran were settled and consequently the claims against Swedish Covenant Hospital based on vicarious liability are extinguished. But, I mean, in reality, the plaintiff's position is there's also conduct by other agents of the hospital that could give rise to vicarious liability of a hospital. The charge versus some other people, not particularly well specified. I don't believe that the record supports that theory, but to the extent that there are any claims remaining based upon any conduct of any agent of Swedish Covenant Hospital, those acts were performed presumptively in good faith. So that's where immunity comes in, in your perspective? Correct. If there's anything remaining, those are protected, they're immune from any liability because of the presumption of good faith under the Reporting Act and the Mental Health Act. I'm assuming that Swedish Covenant Hospital, as most entities do, have mandatory training for their employees? Yes, they do. And there is discussion that the defendants did not even know the requirements of the mandatory reporting statutes and, in fact, there were no documents showing that they had ever read it or agreed. Explain that to me. It's not what I'd like to be interested in. The record does indicate that there was training performed. They were aware of the requirements as mandated reporters. There were questions asked at depositions of a couple of agents, I believe Travers and Gruber. Travers was the charge nurse. Travers was the charge nurse, correct. Whether or not they'd actually read the statute, to which they answered that they had not. I don't know that that is absolutely an obligation, but in any event, that is what they said. This could be helpful. It could be helpful. So to overcome that presumption of good faith, the plaintiff has to come forward with evidence of bad faith, and that evidence is missing here, consequently the presumption of good faith. Whose bad faith are we looking for? In applying these statutes to these defendants, non-Kirin, other than Kirin, are we looking for their good faith? Are we looking for what they knew? Are we looking for evidence? And I don't think there is necessarily evidence that they did anything in their sole discretion or made a determination that disclosure was necessary, because I think they all pretty much took the position that they didn't make any disclosure. I guess where is the evidence vis-à-vis these other defendants? There isn't any. In a way. And I'll start with Dr. Muebel, and I'll look to the affirmative matter that was in support of the motion to dismiss, and that was her deposition testimony. And within that deposition testimony, the medical records were discussed, and none of those medical records indicate that she directed anyone, anyone, to call DCFS or the Chicago police. After learning of Elliot Knott's 30-year history of voyeurism, the incident of the video camera in the bathroom... So this is a little tricky, because you also filed a motion for summary judgment, which the court refused to rule on, but that's more of a summary judgment issue than an affirmative defense issue, isn't it? For Dr. Muebel, I'm just saying. One of your positions on her was there's no evidence. The position is there's no evidence. Not that anything she did was covered by the affirmative defense immunity. Well, she didn't do anything, so there was nothing to be covered. I mean, if she had called, if she had told someone to call, then it would be covered as good faith reporting. But the evidence is that she didn't tell anyone to call. She didn't call. She didn't control state security's decision to call. So just to sort of restate your case for you and tell me if this is accurate in your view, your position before the trial court was, this is all that's possibly left of this case, and as to what's left, there's immunity. But really, this case is much smaller than the plaintiff is trying to pitch it. Is that fair? That's fair, Justice. Turning to the second issue, and that is the vicarious liability, I think we've established that Gilbert v. Sycamore controls this case to the extent that it is based solely upon the actions of the alleged apparent agent, Stacy Kieran. That has been settled. There was a good faith fine that was entered by the circuit court. The claim based on vicarious liability against Swedish Covenant Hospital is extinguished vis-à-vis the acts of Stacy Kieran. To the extent, again, that anything remains, maybe we should identify what that may be. So Charlie Travers provided a deposition testimony. Nurse Gruber provided a deposition testimony. Who else? Nurse Gruber, you may recall, is the nurse that Stacy Kieran spoke to after learning about L.A. Knott's conduct. Nurse Gruber justified, I didn't tell Stacy what to do. That wasn't my role. That was Project IMPACT's decision. That was Stacy Kieran's decision. Stacy Kieran worked for Project IMPACT. They were separate entities. She was operating at Swedish Covenant Hospital, of course. They were an entity that dealt with the intake of people coming in with mental health crises. That's correct, Your Honor. And that's why Dr. Newbold stated, if there was any issue with regard to making a report to DCFS, I would refer that and defer to Project IMPACT, and they would make that decision, not me. That's Dr. Newbold speaking. And I think the same was true for Nurse Gruber and for Nurse Travers as well, the charge nurse. They both said, I didn't tell Kieran what to do. Nurse Travers did clarify in his deposition testimony, I didn't call anyone. He did say that he thought 911 should be called, but he didn't direct Stacy Kieran to call 911. He didn't control what Stacy Kieran was deciding, her discretionary decision to call 911 based upon what she heard from L.A. Knott. Okay, let's just assume that there's a question of fact as to whether he did or not. Let's say there's a question, there's some evidence that he participated, if you will, in her report, because I think that's the plaintiff's position. And there's a little bit of, there's a charge note or something that suggests he told somebody to tell somebody to call. So let's assume that. Then what? Again, in terms of whether you can get past motions. Would that be immune, that conduct? And if so, why? So, I think plaintiff's entire argument today falls on one page in a rather lengthy record, and that's page C2162. And that is a record that was not entered by Nurse Travers. That is Ann Newbold's record. And she says police were notified by charge RN and her PI, which is Project Impact, police state that plaintiff, PT, plaintiff, patient, I'm sorry, okay to be discharged. So Nurse Travers was asked about this record during his deposition, and he said it was false. He said it was incorrect. He said, I didn't tell anyone to call. I didn't call. The only call that was made, and the record supports this, that the only record, the only call, the only report that was made to DCFS and then a report to 911 was made by Stacey Kieran. So what is required to overcome the presumption of good faith? Well, it's evidence of bad faith, and there is not any evidence of bad faith in this case. What does bad faith encompass? Okay, I'm sorry, I'm going to stop you. Just one second. Because I'm still trying to get in my head what conduct are we looking at that immunity could apply to? How do we get there? How do we get there? If everything is like Kieran, Kieran settled out. Right. I would agree with you, Justice Mitchell. I believe that once we address the extinguishment of vicarious liability claims under Gilbert, the case is essentially over. There isn't anything else to consider. Let's assume there's some evidence out there that somebody, whether it's Haren, Chargner's, or Gruber, somebody said to Kieran, yeah, yeah, I think you're doing great. Keep going. And that that's enough to be participation in the report. If that is considered a report, then I would say that that report is governed by the presumption of good faith. We're looking at Kieran's good faith? That's what I'm trying to get at. Are we looking at Kieran's good faith, or Gruber's good faith, or Travis's good faith? Right, I hear what you're saying, Justice McFadden. I think that if it is interpreted that Nurse Travers' statement that she called 911, and Nurse Gruber's, I guess, attendance while Nurse Kieran was calling 911, if that's a part of the reporting process, if that's what resulted in the report, that those acts, too, are protected by the immunity provided under the acts. And then to overcome that presumption, again, you need that bad faith, and that bad faith requires an intent to do something that is wrong, something that is morally deviant. But whose are we looking at? Again, if you know, are we looking at Kieran's bad faith, or their bad faith? I mean, there really could be... And that's a question I also brought up as to knowledge. Whose knowledge are we talking about? That is to say, these other folks, did they know the camera was no longer operating? Right, so, this whole case is premised on this report that was made to 911. The only report that was made was by Stacy Kieran. There is no other report. So the case completely falls apart. Regardless of what they may or may not have said to Stacy Kieran, Stacy Kieran made the only report. So that's all this court should be concerned with, in my opinion. And so there's really no reason to even get to the issue of good faith or bad faith, because that conduct has been extinguished. Okay, but humor us. Correct. Go with us there. Tell us whose knowledge we're looking at, whose good faith we're looking at. Well, the knowledge we're looking at is the knowledge of Stacy Kieran. She's the only one that spoke to Elliot Knott. Yeah, but if they're getting charged with encouraging her, and she knows something that she didn't share with them, why are... It's very confusing, to be honest. The plaintiff argues that there's some evidence in the record to suggest she knew the camera was down. I don't know that that's really true, but let's assume it's true. But why would they know that? Why would Kruber or Travers know that? Why would Kruber or Travers know that? And does that matter? I don't think there's anything in the record indicating that they knew that or not. They knew only what Stacy Kieran told to Nurse Kruber, and then Nurse Kruber relayed it to Charlie Travers. That's all they knew. So the knowledge was what Stacy Kieran had. I hope that answers the question. Ish. You know, it's all very muddled, honestly. It's all really muddled. Right. If the person who made the report tells someone else, oh, I've got a Chicago public school teacher who's put a camera in a bathroom. That, under Justice Minkus' humoring hypothetical, that would be one basket of knowledge. It would be different from Kieran. So if we're talking about how this other person can make use of the immunity, I think this is where I'm struggling with this idea of who knew what. And if then I'm the person she's talking to, and I said, you need to do this. What? As far as the you need to do this idea, I think that was completely eradicated by Stacy Kieran's statement and her two depositions, where it's clear that it was her discretionary decision and her sole discretionary decision to call DCFS and then to call 911. It wasn't that she was being controlled, directed, or otherwise cajoled into making those reports. And that's not what we're suggesting, and I don't think that's what, I know this isn't what I'm suggesting. I know Justice Minkus wasn't. She was just trying to... discuss the other defendants based on the fact that plaintiff has a pimping lawsuit that is before us. I would say if... We're trying to just clarify the... It's not all black and white. There's a lot of gray here. If another agent had made a... a report to DCFS or to the police, then maybe plaintiff would have something to talk about. But no, they didn't think it was me. There isn't anything else. I guess I'll just... Just quickly, just to return to the bad faith idea. In the absence of any dishonest purpose, moral deviance, or a report of false accusation, there's no evidence of bad faith. Plaintiff hasn't come forward with any evidence of bad faith. So to the extent there is any claim for improper reporting, it's governed by the good faith presumption, and the dismissal of those claims should be affirmed by this court. And my final thing, I think I go back to where I began. As a public policy, we want persons that are in mental health crisis to feel comfortable going into places to get treatment before they go shoot up a school. I think that's a general consensus among society. And that comfort level is predicated upon some level of confidentiality of what they disclose to the provider. Do we agree on that part so far? I haven't gotten anything except... Nobody. And the question in this particular case is... whether or not the violation that occurred of the confidentiality fell within the presumptions and the confidentiality that was... No, it's not confidentiality. Within the presumptions that say that they are immune from liability for that act, right? Well, I think the countervailing weight to the confidentiality of people seeking mental health assistance is the provisions in the Mental Health Act and the Reporting Act where there are instances of child abuse or neglect. That, too, must be reported. And if you don't report it, you're subject to criminal investigation and indictment. It's a problem. It's mandated. It's not an option. You must report it. Which is why it's so important that people understand what their responsibilities as mandated reporters. And so that should mean that if they had read and signed off and been trained in this, we might not be here today. And I think that that goes to, you know, maybe it could be argued that CeCe Curran exercised bad judgment. Maybe she was even negligent, but that's not bad faith. And in the absence of bad faith, you know, the count should be affirmed. A dismissal of the count should be affirmed. And she's out anyway. And she's out anyway, correct. Thank you very much. Thank you. Counsel, whenever you're ready. Thanks, Your Honors. First of all, defense counsel stated that there's no evidence of bad faith. We do not have to show bad faith on behalf of these defendants. The standard is that there has to be sufficient evidence to rebut the presumption, which we have done here. If ever there was a case that rebutted the presumption, it's this case. They were required, and I want to touch on ANCRA, since he mentioned acknowledgment and kind of brushed over it like it's no big deal. The statute specifically states that if someone is in a position, such as a medical provider, teacher, et cetera, who is a mandated reporter, they are required to fill out the acknowledgment form. And why? Because the acknowledgment form states that they've read the provisions of ANCRA and that they're familiar with them, and that they know that they should call DCFS at the 1-800 number. They would know not to contact the police in this case. It's up to DCFS to conduct an investigation and get a hold of any police department if they thought it was necessary. And here the proof is in the pudding. DCFS was contacted. They didn't even do a report or an investigation. Case closed. So what should have happened there? This gets into damages. Elliot should have been able to go get the treatment that he needed, and that's public policy would call for that. We want these people to get treatment. He should have gotten the treatment that was necessary. Hopefully he'd get over his sickness. And that's it. Instead what happens, they violate the statutes in numerous ways. One, they never filled out the acknowledgment form, which is required of the statute. Two, they didn't just contact DCFS. They contacted the police department. Nowhere in the statute, and defense counsel did not point that out to you, and that would be very helpful to them, if there was one paragraph in ANCRA that said, oh, the medical providers are mandated reporters, they can contact the police. In fact, they should contact the police. He didn't point it out because it's not in the statute. It's that simple. DCFS is the only one responsible for investigating. With regards to the other statutes, again, it has to be clear, imminent evidence of a serious bodily harm to someone. Here there was no such evidence. Just one real quick question on the record. Do you agree with your friend on MSI that no one other than Kieran made a report? No. I do not agree with that, and I'm going to address that in a second, because that's completely false. These defendants, first of all, Kieran was deposed the first time, and in her, and I understand she's been dismissed and so she's settled out, but I can tell this court that she testified one way, and then upon her second deposition, you can tell she was prepped and she tried to sugar-coat her answers and change her answers, so that when they talk about, well, the record states that the charge nurse called 911, or the charge nurse and Dr. Newbold told you to call 911, she then kind of backtracked and said, well, yeah, that's what the record says, but, you know, I kind of made that decision for myself. That directly contradicts what's in her own record and Swedish Covenant Hospital records, so that's an issue of fact. That doesn't mean this case gets dismissed on 2619. That right there shows you there's a question of fact that has to be determined. Their own records state that these defendants contacted the police, which is a violation of the statute. All that the plaintiff has to show is we have to come forward with evidence and we brought this presumption sufficient to support a finding of a nonexistence of good faith, and we've done that here. Karen, none of these defendants had a good faith basis to contact the police, and that's the main issue in this case. Now, I want to talk about Newbold and if there was any evidence of them directly contacting or persuading Karen to contact the police department. And I'm going to give you some sites. There was evidence that these calls to 9-1-1 were requested by defendant Newbold and the hospital employees, specifically Charlie Travers and defendant Karen, and that's at County Law Record 2162-2163. It's also in the medical records at C-2131-32. At 2163, the Swedish Covenant Hospital nurse, Christine Gruber, informed Karen that the Swedish Covenant Hospital charge nurse, Travers, said to call 9-1-1. So Karen called 9-1-1.  And then after speaking with Swedish Covenant Hospital nurse Gruber, Karen made contact with 9-1-1. Again, the law report said that there was no evidence that anyone from the hospital contacted 9-1-1. That's completely incorrect. The Swedish Covenant's own record states that Travers is an employee of Swedish Covenant Hospital. This is in their record. And I quote, police were notified by charge nurse, RN, and her PI, police state the patient is okay to be discharged. That's at C-2162. Defendant Noe Newbold also admitted in her deposition that her notes stated that the police were notified by the charge RN, which in this case we know is Charlie Travers, who's an employee of Swedish Covenant. And again, Karen, Gruber, and Karen were directed by defendant Dr. Newbold to contact 9-1-1. In Karen's own records, if they want to dispute, which again, Travers can come into his deposition and say whatever he wants, but the Swedish Covenant Hospital record is clear. He contacted 9-1-1. But it's even in Karen's records, C-2162. It says, and this is the LSSI record, indicates RN Christine then informed this writer, that's Karen, that the charge nurse said to call 9-1-1. This writer called 9-1-1. Karen can come in and try to say, well, I made it up myself or whatever, but this shows direction by these defendants to contact 9-1-1. Okay, so I think we're down to your final minute. Okay. Again, you know, you can look at, and this goes towards public policy. I want to just comment quickly on causation. Here's the chronology. September 9th, Elliot goes into the hospital, talks to the defendants. They call a police officer. September 10th, the next morning at 8.46 a.m., CPS sends out a message, an e-mail message. Last evening, Elliot checked himself into a hospital for an evaluation where he spoke with a social worker. CPD has been brought into the loop, but charges are still pending. That's the causation right there. The police didn't have any idea it was him, and you can read the deposition of the police officer, which, again, isn't really relevant because none of these defendants knew what that investigation entailed. That's outside of their scope. We're looking at what did these defendants know at the time Elliot came in there. They didn't know anything about it, but the police will tell you that they had other suspects, and one of them was a janitor, one was another teacher, so any inference that, oh, they knew it was him anyway is not correct. That's the causation. He should have got the treatment that he needed and gone on with his life. Instead, they call the police. He gets arrested, charged with 28 counts, and now his name. He cannot get a job. It's like a scarlet letter. Pull up his name on the Internet. Child pornography and things of that nature. He'll never work again in his life. As far as public policy, one thing the court should keep in mind, it's easy for a defendant to come in and say, oh, look at this scumbag. Everyone with a problem can be looked at as a scumbag. Oh, but this guy's a drug abuser. This scumbag's got drugs. I'm going to call the police on him because he's got a bunch of drugs in his possession. Is that what we want, or do we want these people to get out? Do we want someone who's coming in and saying, hey, you know what? I got these bad feelings. I might go shoot up a school. You know, I'm just having these bad feelings. Do we want them to get the mental health they need, or do we need the medical professionals to contact the police and say, you know what, this scumbag came into my house. He's thinking about maybe shooting up schools and stuff. I think you should go arrest him. Is that what we want? That is what's going on here, and that's why these statutes were typed up. They were not justified. They had no good faith presumption under the ANCA, and there certainly was no clear imminent risk of any serious bodily harm in this case, so they weren't justified under the other statutes as well. Okay. Thank you for your arguments. That will be taken under advisement for further discussion. Okay. Thanks. Thank you.